# EXHIBIT B

**PLAINTIFFS' ORIGINAL PETITION**

Cause No. 2007-72010

| | | |
|---|---|---|
| BOCCARD USA CORPORATION, Plaintiff, | § § § | IN THE DISTRICT COURT OF |
| vs. | § § | HARRIS COUNTY, TEXAS |
| RM MECHANICAL, INC., Defendant. | § § § | 11 ² JUDICIAL DISTRICT |

## Boccard's Original Petition

RM Mechanical, Inc., ("RM") agreed to install trade fixtures for Boccard USA Corporation ("Boccard USA"). RM never complied with its contractual obligations to hire appropriately-skilled workers; to complete its work in good faith in an appropriate, workmanlike, and professional manner; or to meet particular productivity requirements. It induced Boccard USA to increase its pay rate by representing that it needed a pay raise so it could be more productive, and hire more productive workers. Instead, RM used the increased pay to increase its profits. Boccard USA now petitions for relief from RM's breaches of contract, and its tortious and inequitable conduct.

## Discovery Plan

1. Boccard USA intends to conduct discovery under level 3.

## Parties

2. Plaintiff Boccard USA is a Texas corporation doing business in Harris County, Texas. Its home office is at 2500 Galveston Road, Houston, Texas, 77017.

3. Defendant RM is a corporation headquartered in Boise, Idaho. RM does not have a registered agent for service in Texas, but it may be served with process through the Texas

Secretary of State upon its registered agent, William S. Magnuson, 5998 West Gower Road, Boise, Idaho, 83709.

## Venue and Jurisdiction

4.      Venue for this action is proper in Harris County, Texas, because RM agreed that Harris County is the proper venue. Harris County is also a proper venue because Boccard resided in Harris County when these causes of action accrued.

5.      The Court has jurisdiction because Boccard is a Texas resident, RM consented to the jurisdiction of the Texas courts, and Boccard seeks damages that exceed the Court's minimum jurisdictional amount.

## Facts

6.      The Dannon Company, Inc., hired Boccard SA to deliver the WJ-250 Phase 1 project to Dannon's facilities in West Jordan, Utah. Boccard SA assigned to Boccard USA the responsibility of contracting with subcontractors, including mechanical installation subcontractors, who would install in the Dannon facilities the trade fixtures and other personal property sold by Boccard SA .

7.      By Purchase Order 2657-035 dated April 23, 2007 (the "Contract"), Boccard USA and RM agreed that RM would serve as a mechanical subcontractor and furnish all labor, materials, equipment, and other incidental and necessary items consumed and used to install the trade fixtures and other personal property sold by Boccard SA. (A copy of the Contract is attached as Exhibit 1; a copy of the mechanical specifications that the Contract incorporated, and to which RM agreed, is attached as Exhibit 2.) Under the Contract, RM would install the trade fixtures on a time-and-materials basis. It would work in good faith and in an appropriate,

workmanlike, and reasonable manner consistent with the industry's highest standards. The Contract also included productivity requirements under which, *inter alia*, RM agreed that it would weld 3"-diameter pipes at a rate no slower than 2.1 inches per hour, or 0.48 hours per inch welded. The Contract's production output requirement applied to all labor operations needed to advance the installation. RM agreed in the Contract to employ on the Project only highly-skilled, fully-trained, and qualified personnel who were experienced in installing the trade fixtures and equipment that the Project required. The Contract, and the Project's success, depended upon RM's work being appropriate, timely, workmanlike, and professional.

8. Boccard USA signed the Contract before issuing it to RM. As provided for in the Contract, RM accepted the Contract by commencing its performance. The parties based their activities and relationship on the Contract.

9. Unfortunately for Boccard USA, RM's work on the Project did not meet the Contract's standards. RM did not act, work, or bill on the Project in good faith, or in an appropriate, timely, workmanlike, or professional manner. RM's work was slow—it never met the contractual productivity requirements—and, in places, deficient. RM caused huge delays by staffing the Project improperly, often hiring insufficiently-skilled workers. RM also improperly charged Boccard USA for added time resulting from the delays. RM compounded its insufficient work by charging much of this improper added time at overtime rates, resulting in massive cost overruns.

10. RM told Boccard USA that its lack of productivity was due to the billing rates that RM had agreed to accept. Relying on RM's representations that a higher hourly rate was necessary to attract more-qualified workers, Boccard USA and RM eventually agreed to increase the blended hourly rate at which RM was paid beginning with the week of August 12, 2007.

(The Addendum reflecting this agreement is attached as Exhibit 3.) RM's income went up, but its productivity and the sufficiency of its work did not, and rather than conferring a benefit to Boccard USA, there was only detriment caused to Boccard USA by RM.

11. RM's impropriety and inability to meet its contractual obligations ultimately forced Boccard USA to terminate the Contract and hire replacements to finish the work RM had agreed to do.

## Claims for Relief

### A. Breach of Contract

12. Boccard USA incorporates paragraphs 6 through 11.

13. RM contracted with Boccard USA to furnish goods and services for the Project. It agreed to act in good faith and in an appropriate, timely, workmanlike, and reasonable manner consistent with the industry's highest standards. RM was aware of these contractual terms when it agreed to the Contract. It understood that the Project's success depended upon its providing the contracted-for services in an appropriate, timely, workmanlike, and professional manner.

14. RM breached its contractual obligations to Boccard USA when it didn't act, work, or bill on the Project in good faith, or in an appropriate, timely, workmanlike, or professional manner. RM also breached these obligations when it didn't meet its contractual productivity requirements or complete the work it agreed to do in an acceptable manner.

15. RM's breaches damaged Boccard USA in excess of the Court's jurisdictional limits, entitling Boccard USA to recover those damages from RM.

### B. Fraud and Negligent Misrepresentation

16. Boccard USA incorporates paragraphs 6 through 11.

17.     RM affirmatively misrepresented to Boccard USA that increasing the blended hourly billing rate would attract more-skilled labor to the Project and thus enable RM to reach its productivity requirements. RM knew—or recklessly declined to determine—when it made those misrepresentations that the proposed rate increase would not attract more-skilled labor because, even if the more-skilled labor was available at the proposed rate, RM never intended to use the increase to hire more-skilled labor. RM intended for Boccard USA to rely upon those these false and material representations when it made them, and Boccard USA relied on those misrepresentations in increasing the blended hourly rate it paid RM. The misrepresentations injured Boccard USA, entitling it to recover those damages from RM.

18.     RM's billings to Boccard USA affirmatively misrepresented the amount, nature, and quality of RM's work. For example, RM billed Boccard USA for work hours performed by skilled labor, but RM included in those billed hours the work of unskilled laborers. RM's misrepresentations to Boccard USA were material and false. RM either knew the representations were false when it made them or it made them recklessly and positively without knowing whether they were true. RM intended when it made the misrepresentations for Boccard USA to rely upon them, which Boccard USA did. The misrepresentations injured Boccard USA, entitling it to recover those damages from RM.

19.     In the alternative to paragraphs 17 and 18, RM's misrepresentations were false statements of fact that RM made:

- In the course of its business and in a transaction in which it had an interest,

- To Boccard USA for Boccard USA's use, and

- Without using reasonable care or competence in obtaining and communicating those facts to Boccard USA.

Boccard USA relied upon these misrepresentations, which injured it in excess of the Court's jurisdictional limits, entitling Boccard USA to recover those damages from RM.

### C.    Unjust Enrichment

20.    Boccard USA incorporates paragraphs 6 through 11 and 17 through 19.

21.    RM used fraud and took undue advantage of its position as Boccard USA's trusted subcontractor on the Project. RM inflated its billings to Boccard USA's and the Project's detriment. RM misrepresented that an increased billing rate would allow it to increase its productivity by hiring more-skilled labor, but never intended to use the increased billing rate to employ better workers, always meaning to use the increased pay only to boost its profits.

22.    RM unjustly enriched itself at Boccard USA's detriment in excess of the Court's jurisdictional limits. Boccard USA is entitled to recover from RM those unjustly-enriching funds.

### Causation and Damages

23.    RM's conduct proximately caused Boccard USA's damages—general and specific, direct and consequential. These damages include, but aren't limited to, Boccard USA's loss of more than $1,900,000.

24.    As a result of RM's fraud, Boccard USA is entitled to exemplary damages in an amount determined by the trier of fact.

### Attorneys' Fees

25.    Boccard USA is entitled to the reasonable attorneys' fees needed to hold RM to its contractual obligations. As Chapter 38 of the Civil Practices and Remedies Code requires, Boccard USA will present this claim to RM more than 30 days before trial.

**Conditions Precedent**

26.    All conditions precedent to this lawsuit's filing have occurred or been performed.

**Jury Demand**

27.    Boccard USA demands a trial by jury.

**Prayer**

28.    Boccard prays that RM Mechanical, Inc., be cited to appear and answer and that, after trial, Boccard USA recover:

- Actual damages of at least $1,900,000,

- Exemplary damages as determined by the finder of fact,

- All pre- and post-judgment interest allowed by law,

- Its attorneys' fees and costs of suit; and

- All other relief to which it may be entitled.

Respectfully submitted,

**WELSH & CHAPOTON, L.L.P.**

By: _____

H. Ronald Welsh
Texas State Bar No. 21167600
John E. Chapoton Jr.
Texas State Bar No. 04137010
8 Greenway Plaza, Suite 1120
Houston, Texas 77046
Telephone: (713) 554-7770
Facsimile: (713) 554-7771

**Counsel for Plaintiff Boccard USA Corporation**


## ORDER N° 2657-035

**April 23, 2007**

BUYER
BOCCARD USA CORPORATION
2500 Galveston Road
Houston, TX 77017-1925
Ph: 713.643.0681
Fx: 713.643.4939

Contact:
Guillaume Sangouard
Boccard USA Corporation – Cincinnati
1020 Arbor Tech Dr. Suite K
Hebron KY, 41048
Ph: 859.647.0193
Fx: 859.647.2154

SELLER
RM Mechanical Inc.
5998 West Gowen Rd.
BOISE, ID 83709
Ph: 208-362-0131
Fx: 208-362-9790

Contact:
Bill Magnusson ( 208-870-2320 )
Dave Yates ( 208-871-1459 )

The present order is subject to the Purchase Order Terms and Conditions attached to this document as well as to the specific conditions below.

### 1. SUBJECT OF THE ORDER :

This order pertains to the furnishing of all labor, materials, equipment and other incidental and necessary items consumed and used in the installation of trade fixtures consisting of manufactured equipment, personal property and incidental materials that are, by design, required to be affixed to real property and which, for all intents and purposes, shall remain personal property separate and apart from the real property to which it is temporarily attached;

This order is subject to the following set rates regardless of the function of the personnel (skilled journeymen whether pipers, fitters, welders or foremen)

| RM MECHANICAL Inc – HOURLY RATES (ALL FUNCTIONS) | | | | | | |
|---|---|---|---|---|---|---|
| Consumables/hr | Rate up to 50hrs/week* (10hrs/day) Off consumables | Rate above 50hrs/week (>10hrs/day) Off consumables | Saturdays 0 -->10hrs | Saturdays > 10hrs | Sundays | Holidays |
| 1,80 $/hr | 57,45$/hr | 67,2$/hr | 67,2$/hr | 85,2$/hr | 85,2$/hr | 109$/hr |

It is understood that this rate are applicable for skilled journeymen as pipers / fitters / welders /foremen. Qualifications will be submitted to Boccard and checked by Boccard on site. Other categories will have to be discussed specifically (for example: helpers, store keeper ...)

### TOTAL AMOUNT = NOT TO EXCEED $ 592,500.00

This Purchase Order is not a commitment to purchase any particular quantity of man-hours or materials. Buyer is not obligated to requisition sufficient man-hours to reach the Not To Exceed Amount. Seller shall be paid all monies due in accordance with the terms and conditions of the present agreement and subsequent Change Orders. However, Seller shall make no claim for anticipated overhead or unrealized profit if the Not To Exceed Amount is not reached.

BOCCARD USA CORPORATION –
2500 Galveston Road – Houston Texas 77017-1925
*Phone : 713.643.0681 / Fax : 713.643.4939*

*ph*

Page 1 of 8

September 2006

EXHIBIT 1


Note : The fact that the specifications in our order does not include the supplier's reference for items or headings does not excuse Seller from providing labor, equipment and consumables that meet the requirements, needs and specifications, including function and qualities, as ordered. The inclusion of such references is intended only to facilitate inspection after delivery, as well as for identification by item or header.

## PRODUCTIVITY:

| | |
|---|---|
| Production output for working 10 hour days with a 25 man team made up of 17 journeyman fitters and 5 journeyman welders and 2 working field foreman and a 1 general foreman | |
| Stainless steel tubing .065 wall | |
| 1"through 1.5" dia | 1.75 inches / hour |
| 2" through 2.5" dia | 2 inches / hour |
| 3" dia | 2.1 inches / hour |
| 4" dia | 2.1 inches / hour |
| 6" dia | 2.8 inches / hour |

1.1 - **REFERENCE DOCUMENTS:**
- DANNON Contractors Guidelines
- 2657-West Jordan-Mechanical Spec_Rev 1.doc
- NI07-04-01_Rev01doc
- AWS D18.1.
- 0830-PMS-ID5-RevB
- 0830-PMS-OD1-RevB
- 0830-PMS-ID1-RevB

1.2 **GUARANTEE:**
The supplier guarantees all of its goods and work against all defaults of material, labor, function and/or installation for a period of 24 months from our client's acceptance of the installation without reservation arising from your product, but no later than 30 months after the delivery of the product in accordance with the order.
Repairs and reworks covered by the guarantee must be made within a timeframe compatible with the needs of our client 2 business days for the spare parts, if an intervention on site is necessary we ask you to proceed within 2 business days after our request. All costs of repairs and reworks (including parts, labor, and site visits) are to supplier's charge.
In the event of repairs made under the guarantee, all customs, taxes, duties and transportation costs from the site at DANNON, West Jordan, UT to the repair site will be borne by the supplier. The means of transport (air, sea, common carrier, express delivery [DHL,....]) will be determined by the needs of our client.
*In any case, the supplier and BOCCARD will contact one another in order to decide between shipping or repairing the equipment locally.*

## 2. DELIVERY TIME:

**Mobilization starting April 23rd, 2007 for Site personal**

## 3. DELIVERY ADDRESS:

**DANNON**
6165 West Dannon Way
West Jordan, Utah 84088


Order # : 2657-035
Job # : 2657
Attention :
BOCCARD
Hervé Batistan — Cell: 513 518 5840

## 4. CONDITIONS OF PAYMENT :

Net 30 Days, after receipt of conforming invoice and required documentation.

## 5. TERMS of PAYMENT:

Monthly payment as follows:

Upon receipt of monthly invoices that include priced hourly time sheets signed by both parties, 100% of the total amount of invoice will be paid.

On each invoice, 10 % of the total amount invoiced for the project will be deducted to be held as retention.
Half of the total retention held (5 %) will be released to AWD upon completion of the project punch list and the remaining retention (5 %) will be released upon our client's acceptance of the installation without reservation with the terms stipulated herein and on receipt of all required documents.

Payment is contingent upon receipt of all documents mentioned in, and in accordance with, the List of Required Documents

NOTE:
Invoices must list for each item:
- Purchase Order Number,
- Detailed designation of each Item
- Quantity, unit price and total price per item,

All invoices shall be sent to:
BOCCARD USA CORPORATION
Mr. Benoît MOUSSIER
2500 Galveston Road
Houston, Texas 77017 - 1925

In order to limit the number of invoices, the supplier will send a single invoice per payment term, even if the supplier, of his own accord, has made several deliveries (except if the section entitled § Terms of Payment allows for billing of partial deliveries).
Before sending any invoice, the supplier will check that all documents required in this order are properly completed and that they have been sent. If not, the order will be considered unfulfilled and the invoice will be returned.

BOCCARD USA CORPORATION —
2500 Galveston Road — Houston Texas 77017-1925
*Phone : 713.643.0681 / Fax : 713.643.4939*

September 2006


## 6. PRICING TERMS:

The amount of this order is net, firm, final, and not subject to review, for delivery with shipping and handling pre-paid (in accordance with the delivery terms noted in 1 and 2 below), and including the labeling of each article.

    (1) For deliveries originating within the United States, the delivery shall be made on an FOB (UCC) Delivery Address (§3, above) basis.

    (2) For deliveries originating outside the United States, the delivery shall be made on a DDP (Incoterms 2000) Delivery Address (§3, above) basis.

In case of future orders for replacement parts, the conditions of payment for such parts will be identical to those of this order.

## 7. LIQUIDATED DAMAGES:

In the event a contractual delivery date is not met, liquidated damages calculated at 1% of the total amount of the order per day of delay will be applied, not to exceed 10 % of the total amount of the order.
Liquidated damages can be applied automatically and without notification when a deadline is not met.

The collection of liquidated damages in no way implies that Buyer waives its right to any further damages, remedies and/or its ability to require completion of the order.

## 8. PACKAGING AND LABELING

Goods will be shipped in packaging suitable for the type and duration of the transport required for delivery. Seller takes full responsibility to identify and bear the cost of the required packing.
Each package must be easily identifiable and will, at minimum, specify the following:
    Client: BOCCARD USA CORPORATION
    Order Number (see 1st page of order form)
    Job Number (see 1st page of order form)

In addition, each article will be identified with an appropriate labeling showing the article number (see specifications).

*In the event that the goods should require special packaging for reasons of land, air, or sea transport or of warehousing before installation, Seller will specify these instructions on a document attached to the delivery order. In the event of problems resulting from failure to provide this information, Seller will assume full responsibility.*

If the goods are intended for export, Seller must comply with the attached appendix II concerning merchandise delivery.

## 9. INSPECTION, PROGRESS REPORTS

Buyer has the right to request a progress report at any time during the fulfillment of the order. Likewise, it reserves the right to perform any inspections of the goods it may deem necessary in the course of the work.
Buyer's agents or representatives must have free access at all times, from the signing of this order until its completion, Seller's production and planning areas. The tracking, inspection, and verification by Buyer in

BOCCARD USA CORPORATION –
2500 Galveston Road – Houston Texas 77017-1925
*Phone : 713.643.0681 / Fax : 713.643.4939*

PA

September 2006


no case, however, relieves Seller from its responsibilities, particularly as concerns the compliance of the product and the guarantee mentioned in this order.

## 10. REQUIRED DOCUMENTS:

Within one week of date of receipt of order, Seller shall return to Buyer:
- Seller's acknowledgement of receipt.
- Seller's team orgchart with the contact information of
  - o Project manager
  - o Technical manager
  - o Design manager
  - o Planning manager
- Copy of a valid Utah Contractor license relevant to the scope of work.

According to date specified in the list of require document:

In the interest of ease of management of the documentation, with each document delivery Seller will include a letter on company letterhead indicating the following:
- Order Number (see 1st page of order form)
- The name of Buyer's Project Manager (see 1st page of order form)
- The title and the copy number in each required language of all attached documents.

All these documents are to be sent to:

BOCCARD USA CORPORATION
Attention Guillaume Sangouard
1020 Arbor Tech Dr. Suite K
Hebron, KY 41048

**Note:** Seller will attach documents and letters together in order to eliminate any risk of loss.
If a document involves several titles from our appendix, Seller will so indicate (example = requested: installation manual, operation manual – furnished: document representing the installation manual and the operation manual). **Any submittal of documentation that does not follow this procedure will be considered undelivered with all resulting consequences.**

## 11. CANCELLATION OF ORDER

Buyer reserves the right to cancel the order at any time. Notwithstanding Purchase Order Term 8, in such an event, Buyer, upon acceptance by its client, will consider being billed for amounts properly justified and documented by Seller.

In the event of failure on the part of Seller to fulfill its contractual obligations, Buyer reserves the right to cancel the order with no possibility on the part of Seller to claim any compensation on any grounds whatever.

## 12. ADDITIONAL TERMS:

The attached Purchase Order Terms and Conditions are incorporated herein by reference and are contractual terms of this Purchase Order. Seller acknowledges having been made aware of and having accepted the terms and conditions of the order and the Purchase Order Terms and Conditions.

In the event that Buyer's client requires Seller to sign a confidentiality agreement, Seller will do so.

IMPORTANT: All delivery orders, correspondence and billing documents must include our order number.


Best Regards,

Guillaume Sangouard
Project Director
Boccard USA Corporation

Pascal Riu
President
Boccard USA Corporation

## ACKNOWLEDGEMENT OF RECEIPT OF ORDER

Seller : _____

By : _____

Printed Name: _____
                (authorized representative)


# PURCHASE ORDER TERMS AND CONDITIONS

**1. ACCEPTANCE AND INTEGRATION.** Seller agrees to sell and Buyer agrees to buy the goods and/or services (hereafter, "goods") described in the Purchase Order. A valid Purchase Order exists when Buyer (1) assigns a Purchase Order number to Seller and (2) Seller agrees in writing or by commencement of performance to accept such Purchase Order. Seller's acceptance of these Purchase Order terms and conditions is complete and exclusive acceptance of these Purchase Order terms and conditions by Seller, which are incorporated into the Purchase Order. The terms and conditions are those stated herein unless otherwise agreed to in writing and signed by Buyer's authorized representative. The signature of an authorized representative of Buyer on a document presented by Seller in connection with the delivery of any goods shall only constitute acknowledgement that such goods have been delivered and shall not constitute Buyer's acceptance of the goods or Buyer's assent to any terms different from or in addition to those stated in this Purchase Order, notwithstanding anything to the contrary in Seller's document. The Purchase Order constitutes the entire agreement between Buyer and Seller with respect to the subject matter hereof and supersedes all proposals, negotiations, counterproposals and agreements between Buyer and Seller. Electronic purchase orders will be followed by a hard copy, which will form one and the same order.

**2. CHANGES.** Buyer may at any time change packing, destination, specifications, designs, drawings and/or delivery schedules. Any difference in price or time for performance resulting from such changes shall be adjusted equitably in writing. Unless otherwise specified, prices are firm for the duration of the indicated project.

**3. INSPECTION AND REJECTION.** Buyer reserves the right to inspect, test and reject all goods in process of design, manufacture, storage, transit and upon delivery. Final inspection shall be at Buyer's premises or client jobsite unless otherwise agreed to in writing. The performance or non-performance of any such inspections or tests shall not relieve Seller of its responsibilities to supply the ordered goods in accordance with the Purchase Order. Neither the performance of any such inspection or test, nor the payment by Buyer of all or any part of the Purchase Order price shall evidence acceptance of any goods by Buyer. Unless otherwise provided, Seller shall have no right of payment prior to Buyer's inspection and acceptance. Buyer may revoke acceptance as to any goods or portions thereof that are non-conforming, and Seller shall promptly refund any payments Buyer has made with respect to such non-conforming goods.

**4. CHARGES, COSTS AND TAXES.** All boxing, crating, packing, packaging, protective services, transportation, freight, cartage, demurrage or per diem and other similar charges or costs are the responsibility of Seller, and Seller shall be responsible for any applicable sales, use, duties, excise or similar taxes except as otherwise provided in the Purchase Order.

**5. SET OFF.** Any monies due or to become due from Buyer, including claims of assignors, shall be subject to deduction by Buyer of any set-off or counter claim (whether original or by assignment) arising out of this or any other of Buyer's purchase orders or contracts with Seller, regardless of when such set-off or counterclaim arose or such claims were assigned.

**6. TIME OF THE ESSENCE.** Time is of the essence of the Purchase Order. Any samples or drawings required to be submitted by Seller for Buyer's approval, and any goods to be delivered by Seller must be submitted or delivered by Seller in strict accordance with the time stated herein. Seller shall immediately report to Buyer any events or circumstances that may result in failure or delays in submission or delivery. Seller shall be liable to Buyer for any and all loss to Buyer, or loss for which Buyer may be liable, as a result of any delay on the part of Seller.

**7. CANCELLATION FOR CAUSE.** In addition to its right to claim damages, Buyer reserves the right to cancel all or part of this Purchase Order without liability to Seller if (a) proceedings are commenced by or against the Seller in bankruptcy, insolvency or for the appointment of receiver or trustee, or in event of assignment by Seller for the benefit of creditors; (b) Seller defaults under any of its obligations under this Purchase Order, including any warranties; c) goods furnished hereunder are alleged to infringe any patent, trademark of copyright or violate any statute, ordinance, or administrative order, rule or regulation; or (d) Seller's failure to make progress could jeopardize performance or deliveries as specified.

**8. CANCELLATION FOR CONVENIENCE.** In absence of Seller's default, Buyer may cancel all or part of the Purchase Order at any time, in which case Buyer shall pay Seller the amounts due in consideration of work already performed and accepted by Buyer as of the date of cancellation, after deduction of any advance payments made. Seller shall make immediately available to Buyer the works performed.

**9. WARRANTIES.** Seller warrants that the goods supplied under this Purchase Order (a) are fit and sufficient for the purposes intended; (b) are merchantable, of good quality and free from defects, whether patent or latent, in material and workmanship; and (c) are new and in strict accordance with Buyer's specifications. This warranty shall remain in effect so long as Buyer is bound to correct any defects in the goods or for a period of twelve months, whichever is longer. In the event the goods are not in conformance with the warranty, Seller at its own expense, promptly after notice, shall repair or replace such goods. If Seller fails after reasonable notice to repair or replace the defective goods, Buyer may repair or replace the goods and charge the Seller all related costs without voiding the warranties hereunder.

**10. SUBMITTALS, DATA AND SAMPLES.** All goods, material and equipment furnished under this Purchase Order may be subject to the approval of an architect, engineer or other party to the project for which the goods are to be used, and Seller shall furnish the required number of submittals, data or samples for said approval. In the event a required approval is not obtained, this Purchase Order, at Buyer's option, may be cancelled, with no liability on the part of Buyer.

**11. INDEMNITY AND INSURANCE.** Seller agrees to hold Buyer harmless from, and to protect, defend and indemnify Buyer against, any and all claims, demands, losses, liabilities, damages, costs, and attorney's fee and expenses arising from or suffered or incurred or any manner connected with: (a) any claim or injury to person or property caused in whole or in part by any act or omission by Seller, Seller's agents or employees in the furnishing of or arising out of the use such goods or in the performance of work hereunder, while executing this Purchase Order or making delivery hereunder, (b) any claim with respect to any of the goods called for by this Purchase Order, for infringement of any patent, copyright, trademark, trade name, brand or slogan, or unfair competition or any adverse claim of statutory or non-statutory rights; ( c ) any alleged violation by such goods, or their manufacture or sale, of any federal, state, or local statute, ordinance, or administrative order rule or regulation; or (d) the performance or non-performance of Seller's obligations hereunder. The rights and remedies described herein are non-exclusive, and Buyer shall have all rights, remedies and defenses available to it under law or equity. Seller shall secure and maintain an insurance policy from an insurance company acceptable to Buyer. The insurance company(s) will have a minimum AM Best rating of A VIII applicable to its commercial general liability, automobile, workers compensation, umbrella and environmental liability at the limits shown hereafter. Coverage for commercial general liability and environmental liability must be for a minimum amount of the greater of $1 million or two times the Purchase Order amount per insurable incident and per year, covering damages to persons and tangible and intangible assets. In case Seller is present on the site of Buyer, Buyer's subcontractors or suppliers, or Buyer's client, Seller will maintain (1) worker's compensation insurance as prescribed by applicable law, (2) employer's liability insurance of not less than $1 million per occurrence, and (3) automobile bodily injury and property damage liability insurance that shall extend to owned, non-owned and hired automobiles used in the performance of the Purchase Order, with limits of liability of not less than $500,000 per occurrence for bodily injury, $500,000 per occurrence for property damage, and not less than $1 million in total coverage if a Combined Single Limit is provided. For any material or equipment furnished by Buyer to Seller, Seller shall maintain property insurance with limits at least equal to the replacement cost of the material or equipment. All insurance coverage must be valid through the entire Purchase Order warranty period. Seller shall provide to Buyer certificates of insurance setting forth the coverage as required above together with the insurance company's name, policy

**BOCCARD USA CORPORATION –**
2500 Galveston Road – Houston Texas 77017-1925
*Phone : 713.643.0681 / Fax : 713.643.4939*

September 2006


number and expiration dates of insurance. Seller shall add Buyer and its client as additional insureds on its commercial general liability and environmental policy and such coverage shall be primary and non-contributory to any applicable coverage carried by Buyer. Buyer shall be an additional insured to the full limits of liability purchased by Seller even if those limits of liability are in excess of those required by this Purchase Order. The coverage should not contain special limitations (other than limiting coverage to operations or activities arising out of the performance of the Purchase Order). Any such endorsements limiting coverage must be submitted for Buyer's review/approval. All such policies shall provide that the policy shall not be cancelled, non-renewed or materially altered except upon not less than thirty (30) days' written notice to Buyer and shall expressly mention a waiver of subrogation by Seller's Insurance company against Buyer or its client. Failure of Seller to provide the certificates referenced hereunder, or failure of Buyer to request such certificates shall in no way limit or release Seller of its obligations or liabilities under the Purchase Order.

12. COMPLIANCE WITH LAWS. Seller agrees to comply with all applicable federal, state, and local laws, executive orders, codes, and regulations and shall indemnify and hold harmless Buyer from any liability for any violations thereof.

13. RISK OF LOSS. Irrespective of vesting of title, Seller shall bear the risk of loss from any casualty to the goods, regardless of the cause thereof, in transit or otherwise, until Buyer has accepted the goods, notwithstanding the manner in which the goods are shipped or the party responsible for freight or other transportation costs.

14. GOVERNING LAW. This Purchase Order shall be governed by and interpreted in accordance with the laws of the State of Texas. No court proceedings pertaining to this Purchase Order may be initiated other than in federal or state courts located in Harris County, Texas, and Seller hereby consents to the jurisdiction of these courts.

15. DEFAULT. If Seller defaults in performing any of its obligations under this Purchase Order, Buyer, in addition to all rights and remedies provided for in this Purchase Order, shall have a right to recover all damages sustained by it, directly, indirectly or consequentially, including but not limited to any claims of Buyer's customers and loss of profits, as well as the rights and remedies provided to a buyer with respect to defaults by a seller. In addition, Buyer shall be entitled to recover from Seller its attorneys' fees and costs incurred in enforcing the terms of this Purchase Order.

16. ASSIGNMENT AND SUBCONTRACTING. Seller may not, without Buyer's prior written consent, assign or transfer this Purchase Order or any rights, obligations or monies due hereunder. Seller shall not subcontract part or all of this Purchase Order without Buyer's prior written consent.

17. TITLE. Seller warrants that all goods furnished hereunder will be delivered free from any and all security interests, liens, encumbrances and claims of any nature and that Seller has good title to the same and transfer of title is legal and enforceable.

18. CONFIDENTIALITY. Seller shall not disclose the terms of this Purchase Order except as required by law or authorized by Buyer in writing.

19. WAIVER AND SEVERABILITY. No provisions of this Purchase Order may be changed, terminated, modified, discharged or rescinded, except in writing by Buyer. No delay or failure in exercising any rights hereunder or partial exercise thereof shall constitute a waiver of such rights or any other rights hereunder. If any provision of this Purchase Order shall be held to be unenforceable in any respect, such holding shall not affect the enforceability of any other provision of the Purchase Order under any circumstances.

BOCCARD USA CORPORATION –
2500 Galveston Road – Houston Texas 77017-1925
Phone : 713.643.0681 / Fax : 713.643.4939

September 2006

## SECTION 1.0 PROJECT PROVISIONS

**1.1     GENERAL CONDITIONS**

1.1.1     This document is issued for Bid and Construction to the Mechanical Fabrication/Installation CONTRACTOR for the DANNON West Jordan Project. The purpose of this document is to define the specific mechanical installation package, including erection and fabrication requirements to the CONTRACTOR to assure the mechanical installation is well planned and executed safely with a high level of quality. The term "CONTRACTOR" used in this document is defined as the Mechanical CONTRACTOR and its sub-CONTRACTOR(s) that are bidding this package and may be awarded this package or part of it.

1.1.2     The CONTRACTOR shall submit a **composite price** for all trades and qualifications and a detail of **consumables per hour** to be provided for the execution of the intended project; the bidding CONTRACTOR shall break-out options and details as requested and discussed.

1.1.3     During the Bid Process questions are encouraged and should be directed to the BOCCARD Project Manager or BOCCARD Site Manager for clarification. All questions received by the Project Manager shall be answered to all bidders to assure proper communication.

1.1.4     The CONTRACTOR shall notify BOCCARD immediately of any discrepancy within or between this specification and/or the field conditions, for resolution prior to beginning of fabrication or erection.

1.1.5     The CONTRACTOR proposal shall clearly state in writing any and all exceptions to this specification.

1.1.6     The CONTRACTOR shall submit a complete list of names and addresses of Sub-CONTRACTOR(s) who are being considered for various portions of the work. At the time the Contract is awarded, the successful bidder will be required to submit a list of specific Sub-CONTRACTOR(s) to whom work will be awarded. The Owner and/or BOCCARD retains right of approval of all Sub-CONTRACTOR.

1.1.7     The CONTRACTOR proposal shall detail expected team organization and shall include the supervision necessary to appropriately manage their team safely and efficiently.

1.1.8     BOCCARD Contacts

EXHIBIT 2

BOCCARD Project Manager
Guillaume Sangouard
513.518.5319
gsangouard@boccard.fr

BOCCARD Site Manager
Hervé Batistan
513.518.5840
hbatistan@boccard.fr

## 1.2     CONTRACTOR BID DETAIL REQUIRED

1.2.1   The CONTRACTOR base proposal shall be made on the basis of the workforce/team necessary and intently provided, working equipment and tools, procedures and requirements specified in this specification. If alternative methods or materials exist which would be of benefit to the Owner and/or BOCCARD from a point of view of cost, delivery or ease of operation, the CONTRACTOR is required to include these as an alternative proposal. Alternative proposals must be accompanied by complete details of the proposed deviations. If acceptable, these alternatives shall be approved in writing by BOCCARD prior to execution.

1.2.2   The CONTRACTOR Bid shall include:

1.2.2.1 **Hourly composite price in USD per person** (regardless of qualification), inclusive of any expense, necessary tools and accessories to satisfy the scope of this project. Base for schedule will be of daily 10Hrs on a 5 days per week duration.

1.2.2.2 **Foreseen productivity in Diameter-inch per hour** for proposed team

1.2.2.3 Productivity levels for CONTRACTOR will be monitored by BOCCARD on-site team. However, CONTRACTOR remains responsible for working at a productivity level defined by CONTRACT and required to meet the schedule.

1.2.2.4  No paid lunch break time nor travel time will be accepted in this offer.

1.2.2.5  Transfer of personnel from one CONTRACTOR to another during a single project phase is not allowed and will end by the removal of the individual from the site. CONTRACTOR remains responsible for providing sufficient personnel to maintain the schedule, and any overtime required to make up for the removal of transferred personnel will be at CONTRACTOR's sole expense.

1.2.2.6   Transfer will be accepted in between project phases or upon writing acceptance from BOCCARD

1.2.2.7   All taxes, fees and permits and employee-related expenses shall be paid by CONTRACTOR.  BOCCARD is not the employer of CONTRACTOR, its personnel, its Sub-CONTRACTOR(s), or their personnel.

1.2.2.8   The CONTRACTOR will comply with BOCCARD studies, drawings, modeling and plans, and any modification to or deviation from the foregoing will be considered as "Non-Conformity" and will be corrected at CONTRACTOR costs and expenses.

1.2.2.9   Eventual need for pre-fabrication at CONTRACTOR workshop shall undergo a specific bid/request from BOCCARD.

1.2.2.10  Site timetable will be determined and confirmed by BOCCARD; there will be a 1 hour lunch break.

1.2.2.11  CONTRACTOR will provide to BOCCARD prior to start welders certifications, welding procedures and welding equipments on site.

1.2.2.12  CONTRACTOR will keep its workforce available for the entire period foreseen for the works at the level required to maintain the schedule.

1.2.2.13  CONTRACTOR is to provide its own local power cabinets for workshop and site construction.  CONTRACTOR will advise BOCCARD of the amount of power supply needed to be provided by DANNON.

1.2.2.14  Trailers and offices will be provided by BOCCARD

1.2.2.15  CONTRACTOR will provide rental rates for forklifts and scissors lift.

1.2.3   Change Control and Request for Information

1.2.3.1   CONTRACTOR shall request from BOCCARD in writing any clarifications to this specification that impact cost, quality, schedule or safety, and BOCCARD will respond in writing through the BOCCARD Project Manager or designee.

1.2.3.2   After award of contract, the CONTRACTOR shall not proceed with any proposed changes or modifications until authorized to do so by BOCCARD in writing.  The cost of any work performed on

proposed changes or modifications without BOCCARD written approval will be at the CONTRACTOR's expense, as well as any cost for re-working such unauthorized work.

1.2.3.3   Bid prices shall be guaranteed for a period of not less than 2 months following bid receipt.

1.2.3.4   Upon acceptance of contract by the CONTRACTOR, prices shall be kept at bid prices for the duration of the construction unless discussed and duly accepted and confirmed in writing by BOCCARD.

1.2.3.5   Schedule of execution of scope - **To be developed and confirmed with BOCCARD**

1.3       Attachment for Bidding


# SECTION 2.0 SAFETY

2.1       It is the intent for this project to be executed with safety as the foremost issue. The CONTRACTOR and any sub-CONTRACTOR shall conduct themselves in their daily activities in a safe manner with safety being the foremost concern with any task. The CONTRACTOR shall submit a safety program to BOCCARD for review and approval prior to beginning of work. The CONTRACTOR shall be aware and enforce with their staff any OSHA Regulations or plant regulations (whichever is more stringent).

2.2       The CONTRACTOR will receive and review DANNON CONTRACTOR Guidelines, which would be the minimum requirement and shall be enforced at the plant.   The CONTRACTOR also shall implement any safety rules required by BOCCARD.

2.3       The CONTRACTOR shall emphasize cleanliness of their areas of work at all times.  All trash, debris, leftover piping, etc. shall be removed from the areas following end of working phase or latest at the end of the day; power supply cables shall be laid in a proper and satisfactory manner so as not to disturb any other works.

2.4       The CONTRACTOR shall participate in a DANNON Safety Program. The CONTRACTOR shall be responsible for assuring that all craft labor under their control has reviewed DANNON CONTRACTOR Guidelines and shall verify to BOCCARD that all labor is adequately safety trained prior to work. This can be done by affixing a hard hat sticker. This program does not take place of the CONTRACTOR own safety training and is only a supplement.

Record of individual's participation in this safety training must be kept by the CONTRACTOR and provided to the BOCCARD Site Manager or Project Manager.

2.5    The CONTRACTOR shall maintain proper housekeeping practices at all time in their areas of work in the facility and in all other places to which CONTRACTOR has access, including but not limited to offices, trailers, storage areas, common areas, etc.

2.6    The CONTRACTOR shall examine all areas and conditions under which this work is to be installed. Unsatisfactory conditions shall be immediately brought to the attention of BOCCARD. The CONTRACTOR shall not proceed with the work until the conditions have been corrected. Beginning of work will be construed as acceptance of the conditions within an area.

2.7    A "Safety Understanding Agreement" application will be issued and signed per individual.

2.8    The CONTRACTOR personnel shall wear to proper PPE to perform the work. For the work area, it shall be a minimum of hard hat, safety shoes and safety glasses.

2.9    Prior to start, BOCCARD will define and assign hard hats colors for each CONTRACTOR to facilitate recognition of personnel of a single CONTRACTOR. White shall be reserved to Foreman and Project Managers, with affiliation to a particular CONTRACTOR indicated by use of stickers pertaining to CONTRACTOR company.

2.10   Disregard of DANNON and/or BOCCARD safety rules will be followed by removal of entities responsible and may lead to removal of CONTRACTOR from the site or other legal action.

## SECTION 3.0 SITE CONDITIONS

3.1    The project work site is located in West Jordan, Utah.

3.2    There is no smoking allowed on the DANNON West Jordan plant. Smoking areas shall be designated at location of CONTRACTOR facilities.

3.3    A reasonable daily morning and afternoon coffee break is tolerated.

3.4    Prior to bidding, a meeting will be scheduled at the job site to review the project and for the purpose of CONTRACTOR familiarization with existing site conditions. The CONTRACTOR shall state in his proposal that he has visited the site and is thoroughly familiar with its safety requirements, work rules, access, temporary facilities, etc. Unfamiliarity with site conditions will not be accepted as a basis for change to the base proposal.

3.5    The CONTRACTOR is responsible for the temporary facilities provided to them on site.

3.6    Cancelled

3.7    BOCCARD will inform the CONTRACTOR about the location and area available for personnel facilities, temporary fabrication shop and storage/lay-down area.

3.8    All CONTRACTOR and sub-CONTRACTOR personnel shall be highly skilled, fully trained, and qualified to do their assigned work/job. The CONTRACTOR and sub-CONTRACTOR shall maintain documentation on their employee "qualification" process, including education, training, and work experience of their qualified employees. It is understood as a basis for execution of this effort that all personnel are experienced with the installation of dairy equipment, sanitary piping and knowledgeable of 3A standards, PMO and GMP Standards, and DANNON CONTRACTOR Guidelines.  Failure by CONTRACTOR or sub-CONTRACTOR(s) to supply personnel conforming completely to 3.8 is grounds for termination of the CONTRACT and non-payment for work.

3.9    The CONTRACTOR shall take precautions to protect existing walls, floors, ceilings, roofs, windows, doors, piping and equipment from damage. Tarpaulins, plywood or drop cloths shall be used around work areas to protect personnel and building/equipment damage.

3.10   Parking for contractor employees will be outside the site

3.11   There will be room for (XX) equipment /office trailer on-site for the CONTRACTOR.

3.12   BOCCARD will provide outside chemical toilet facilities for the CONTRACTOR.

3.13   The CONTRACTOR may not use the Owners Toilet, locker room, maintenance, office, lunchroom or parking facilities unless specified in writing by Owner.

## SECTION 4.0 SEQUENCING, SCHEDULE AND PROGRESS MEASUREMENT

4.1    It is the expectation of BOCCARD that the CONTRACTOR will proficiently manage, execute and implement the project scope.  CONTRACTOR commits to work in good faith and in accordance with highest industry

standards.  CONTRACTOR further commits to deal fairly with BOCCARD and the Owner and other trades on site.

4.2    Daily timesheets comprising names, positions and hours worked of each person will be presented to BOCCARD Construction or Site management for acceptance, and will be the basis of invoicing.

4.3    Besides presentation of welders' certifications, a trial test may be required by BOCCARD.

4.4    The CONTRACTOR shall participate in a weekly construction/planning meeting with BOCCARD to further detail the overall construction sequencing and CONTRACTOR interfaces.

4.5    CONTRACTOR is to provide their weekly progress based on the isometrics drawings that would be compared with BOCCARD report and the diameter inches achieved, to verify progress, productivity and planning.

4.6    Based on weekly results for productivity, action may be required from the CONTRACTOR to reach their original contractual ratio.

4.7    The CONTRACTOR shall report the actual installed/fabricated progress of the work to BOCCARD. This data will be used to track progress and report earned value to the Owner. This will be required weekly unless a higher level of planning is required (i.e. shut-down planning).

4.8    The CONTRACTOR shall be responsible for coordination and cooperation with BOCCARD, the Owner and other trades so that the installation is performed with minimum interference and conflict. It is imperative that the CONTRACTOR cooperate closely with these parties in maintaining a safe and efficient work site for all working at the site. Site logistics and shut-down activities shall be pre-planned as not to interfere with the existing operation of the facility and to facilitate a safe and timely execution of work activities.

4.9    The CONTRACTOR shall be responsible for the timely procurement of his consumables. The CONTRACTOR shall schedule procurement of all consumables so that they may be delivered within the terms of the intended schedule.  Any difficulties in procurement affecting the intended schedule should be promptly reported to BOCCARD in writing, and may result in back charge of subsequent losses to the CONTRACTOR.

4.10    BOCCARD reserves the right to remove any of CONTRACTOR employees and sub-CONTRACTORs and their employees from site for under productivity, quality, violation of safety rules or any other misbehavior.

4.11    Mobilization of workforce will be planned in agreement with BOCCARD under reasonable notice

## SECTION 5.0 DELIVERIES, STORAGE AND HANDLING

5.1     BOCCARD will generally supply all construction materials other than consumables and equipments (valves, instruments and pumps, etc. from the P&IDs) from their warehouse or storage on- site.

5.2     Lifting devices for equipment (cranes) will be provided by BOCCARD.

5.3     CONTRACTOR will handle and properly locate the equipments in accordance with the plant design prior to start piping fabrication.

5.4     Before accepting any materials and equipment onto the job site, the CONTRACTOR and BOCCARD shall inspect the materials and equipment. Any materials and equipment which are found to be damaged or defective or unsuitable for the intended service will not be accepted.  No piping with visible rust scars shall be used.

5.5     The CONTRACTOR shall provide suitable protection from dampness, damage, dirt, etc., for all equipment and materials during construction until final acceptance by BOCCARD and the Owner.  Such protection shall be by a means acceptable to BOCCARD and the Owner.

5.6     All handling of materials and equipment shall be done in accordance with the manufacturer's recommendation and in a manner which will not damage or reduce the serviceability of the material and equipment, for which damages or reduction of serviceability CONTRACTOR will be liable.

## SECTION 6.0 INSTALLATION REQUIREMENTS

6.1     Piping Mechanical Drawings and Conditions

6.1.1   The general arrangement of the piping work shall be as indicated on the drawings. The CONTRACTOR shall carefully examine the drawings, models and specifications and shall be responsible for the proper fitting of materials and equipment in the building of the system as indicated, without alteration unless approved in writing by BOCCARD.  The CONTRACTOR is responsible to report promptly to BOCCARD any discrepancies or clashes within and between the various drawings, models and specifications and is liable for any reworks required as a result of any failure to report such discrepancies or clashes.

6.1.2    The CONTRACTOR shall install piping and piping accessory items furnished with equipment.

6.1.3    The CONTRACTOR is responsible for piping work for new system tie-ins to existing plant systems. The CONTRACTOR shall coordinate with BOCCARD and the Owner prior to connecting to the existing plant systems.

6.1.4    This specification contains requirements for hangers and supports not shown on the drawings. The CONTRACTOR will install pipe hangers and supports required to support piping systems which are above ground or above slab. Piping systems which are buried or embedded are not included.

6.1.5    All drain valves identified on P&ID's shall discharge into a funnel (appropriately sized for flow) and be routed to a flow drain. There shall be an air break between the valve discharge and the funnel. The funnel and drain piping shall match the system material specification of the drain valve piping.

6.1.6    Threaded joints shall **only** be provided where needed to connect valves, equipment and piping specialty items with threaded ends.

6.2    Definitions

6.2.1    "Installation", regarding site, shall mean receiving, transporting, unloading, storing, applying, inspecting, testing, and proving complete piping systems in accordance with these specifications.

6.2.2    "Pipe" shall mean both pipe and tubing.

6.2.3    "Fitting" shall mean all fittings (elbows, tees, crosses, unions, flanges, caps, reducers, special fittings, etc.).

6.2.4    "Pipe hangers" shall include rigid hangers, spring type hangers, constant supports, sway braces, and guides. Rigid hangers encompass hanger and stanchion components including anchors, and guides.

6.2.5    "Supports" shall include auxiliary steel members required for: intermediate supports between building structural steel; intermediate supports between structural concrete slabs; fabrication of brackets, braces, and multiple bank supports; fabrication of anchors, restraints, and guides.

6.2.6   "Owner" shall mean DANNON COMPANY, INC. as represented by the West Jordan Project Manager and any other representative so designated by him.

6.2.7   "BOCCARD" shall mean BOCCARD USA CORPORATION as represented by the BOCCARD Project Manager working for the Owner and any representative so designated by him.

6.2.8   "CONTRACTOR" pertains to any potential CONTRACTOR or sub-CONTRACTOR bidding and executing jobs associated with this project.

6.2.9   The drawings identify each pipeline with a pipeline designation comprised of five (5) parts.

An example is:

112-CIP-OD-3.0-0169   Where:

- 112   is the originating P&ID number designation
- CIP   is the service designation
- OD   is the is the nominal size of the pipeline
- 0169   is the sequential identifier

6.3   Piping Support

6.3.1   The Piping CONTRACTOR shall be responsible for fabricating and installing all materials required for the adequate support of all new and existing piping identified in this scope of work. The Piping CONTRACTOR shall insure that all ancillary structural supports are of adequate size to support the load of the new piping systems.

6.3.2   All ancillary support elements shall be made of 304L SS tubing fully closed and welded and shall have a smooth surface/weld with no cracks, crevices, threads and be impervious. Finish for all support elements in Process Areas shall be suitable for food application.

6.3.3   For all supporting installed by the Piping CONTRACTOR, the ends of all support shall be square cut and smooth. All exposed sharp edges/corners shall be broken or rounded. Piping CONTRACTOR shall assure that no sharp edges exist on any hanger component.

6.3.4   All piping supports shall be installed by the Piping CONTRACTOR according drawings or agreed with BOCCARD Construction Manager or representative. Piping spans shown below shall not exceed the chart below unless approved by the BOCCARD Project

Manager.

## Piping and Tubing Maximum Unsupported Span

| Nominal Pipe Size | Sch. 40 S.Steel and Heavier Pipe | Sch. 5S, Tube and Sch. 10S Sanitary Stainless Steel |
|---|---|---|
| 0.5" | 7 | 5 |
| 0.75" | 7 | 5 |
| 1.0" | 7 | 6 |
| 1.5" | 9 | 8 |
| 2" | 10 | 8 |
| 2.5" | – | – |
| 3" | 12 | 10 |
| 4" | 14 | 11 |
| 6" | 17 | 13 |
| 8" | 19 | 14 |

6.3.5   Piping shall be supported at each change of direction.

6.3.6   Piping shall be appropriately guided as to control the movement of piping on the pipe rack.

6.3.7   Special care shall be taken where pipe is connected to valves or equipment to ensure that stresses are not transmitted to the piping system due to improper fit or excessive movement of the equipment.

6.3.8   Where a valve, flow meter, etc., is installed in a pipe line, a hanger should be placed on either side of the valve, flow meter, etc.

6.3.9   Tube hangers shall be hex type and conform to the 3A sanitary standards for tube hangers for milk and milk products (#63-00) as manufactured by Bradford or approved equal.  Hangers shall carry 3A the symbol.

6.3.10  Steam and Condensate Piping shall be installed with 3" shoe.

6.3.11  Cold piping installed with Insulation shall be placed on insulation shied to protect insulation.

6.4     Equipment Installation

6.4.1   Equipment shall be located and oriented as indicated on piping drawings.

6.4.2   The CONTRACTOR shall be responsible for the proper installation of all equipment. All equipment shall be located and oriented by the equipment arrangement drawing. Any discrepancies with any other drawings shall be brought to the Owner's attention before installation.

6.4.3   All equipment shall be installed to allow for proper housekeeping and cleaning around and under equipment. All equipment needs to be 12" above floor.

6.5     Field Routed Piping Guidelines

6.5.1   Route new piping at established elevations of existing piping to minimize support problems and present a well-designed appearance.

6.5.2   Provide adequate clearance for operation and maintenance around valves, meters and equipment.

6.5.3   Routing shall be in most direct path possible utilizing existing support steel as much as possible.

6.5.4   Piping shall not be run across walkways or working spaces where it could be a safety hazard.

6.5.5   Maintain proper overhead clearance (7'-6" BOP) when piping is located over walkways, maintenance access areas or operational areas where low piping could be a safety hazard.

6.5.6   All valves shall be located and so they can be accessed for maintenance and operation.

6.5.7   Piping shall be routed so it can be adequately drained and not trapped except at low point drains indicated on P&ID's.

6.5.8 Routing shall be in most direct path possible utilizing existing support steel as much as possible.

6.6 Piping Identification

6.6.1 All piping shall be labeled by using the following table and ANSI13.1-1981:

| Piping Diameter | Size of Letters |
|---|---|
| ¾" to 1 ¼" | ½" |
| 1 ½" to 2" | ¾" |
| 2 ½" to 6" | 1 ¼" |
| 8" to 10" | 2 ½" |
| 12" | 3 ½" |

6.6.2 Labels shall be spaced 20' apart with the appropriate colored letters and background to be approved by BOCCARD and Owner.

6.6.3 Labels shall be adjacent to each valve.

6.6.4 Labels shall be located at all equipment connections.

6.6.5 Labels shall be located to each elbow or tee

6.6.6 Labels will be made with label making machine or procured by Piping CONTRACTOR.

6.7 Testing and Cleaning

6.7.1 The Piping CONTRACTOR shall assist the BOCCARD Project Manager in the testing, cleaning and flushing of the piping and equipment. This will include the removal of all in-line equipment that may be damaged by this process and the reinstallation after the testing and cleaning is competed.

6.7.2 Piping CONTRACTOR shall clean the inside of all piping, fittings, valves to assure free of loose scale, rust, weld flux, slag, dirt or foreign materials. Piping CONTRACTOR shall cover the exposed ends of all Piping to assure the inside will be free of contaminates.

## SECTION 7.0 QUALITY

7.1 If applicable, all materials furnished by the CONTRACTOR shall be new and free from defects. No materials, whether furnished by the CONTRACTOR, BOCCARD and/or the Owner shall be installed or used in

a fabrication assembly if the items are physically damaged or functionally defective.

7.2   All work performed by the CONTRACTOR shall be of good quality and performed in a safe manner.  The CONTRACTOR and his employees shall observe all job site work rules.  The CONTRACTOR shall not perform any work during periods in which environmental or site conditions may adversely affect the serviceability of the installation.  The CONTRACTOR, in performing his work, shall not damage, destroy or otherwise reduce the serviceability of an existing installation or work performed by others including, but not limited to, roofing, insulated panels, floors, structural steel, and buried piping.  The CONTRACTOR shall repair any damage at his own expense and at the direction and approval of BOCCARD and/or the Owner.  If conflicts arise, the CONTRACTOR shall immediately report them to BOCCARD and/or the Owner for resolution.  Any work performed by or materials installed by the CONTRACTOR found to be unsatisfactory upon inspection by BOCCARD and/or the Owner shall be rectified by the CONTRACTOR at his expense.

7.3   The CONTRACTOR shall perform welding of metallic piping systems with qualified welders and welding operators in accordance with the applicable code for the system, including PMO and 3A.  A copy of the CONTRACTOR welding procedures shall be submitted with the proposal.  These welding procedures shall also be maintained at the project site for review.  Qualification records for all welds and welding operators shall be maintained in accordance with the applicable Code.  A copy of the qualification records shall be submitted to BOCCARD.  Records shall be kept current at all times.

7.4   Prior to beginning fabrication of any systems under this Section, the CONTRACTOR shall prepare and submit for approval by BOCCARD three quality control samples of pipe joints made in accordance with applicable specifications.  The CONTRACTOR shall prepare and submit additional samples as required until three samples of each pipe system are approved by BOCCARD.  One approved sample will be returned to the CONTRACTOR.  The approved samples shall be the basis of minimum acceptable quality of pipe joints furnished under this contract.  These samples will be kept by BOCCARD at the job-site.

7.5   BOCCARD reserves the right to have welds removed at the BOCCARD expense for inspection. Any welds that are found to be sub-standard will be replaced at the CONTRACTOR expense.


## ORDER N° 2657-055 Addendum N°1                    August 3, 2007

BUYER
**BOCCARD USA CORPORATION**
2500 Galveston Road
Houston, TX 77017-1925
Ph: 713.643.0681
Fx: 713.643.4939

SELLER
RM Mechanical Inc.
5998 West Gowen Rd.
BOISE, ID 83709
Ph: 208-362-0131
Fx: 208-362-9790

Contact:
Guillaume Sangouard
Boccard USA Corporation – Cincinnati
1020 Arbor Tech Dr. Suite K
Hebron KY, 41048
Ph: 859.647.0193
Fx: 859.647.2154

Contact:
Bill Magnusson ( 208-870-2320 )
Dave Yates ( 208-871-1459 )

The present order is an addendum to the original PO **2657-035.** All other conditions remain the same.

### 1.  SUBJECT OF THE ORDER:

The GOAL of this PO is to increase the crew on site of 32 additional people within 3 weeks as described:

- RMM is asked to mobilize 12 additional people within the 13th of august.  .

- RMM is asked to mobilize another 20 additional workers one week after the 13th.

The hourly rate will be increased as shown in the following table.

Date of effect for the new people: At there arrival onsite.

Date of effect to switch ALL the people with the rates of table-1 : When the first-12 people are on site.
Foreseen date is Monday the 13th.

We still reserve the right to refuse someone who would not be qualified for the job.

The new people on site can NOT be taken out from one of our subcontractors crew (AWD, CMC, or future ones not listed contracted by Boccard  unless if agreed by Boccard)

**BOCCARD  USA CORPORATION –**
2500 Galveston Road – Houston Texas 77017-1925
*Phone : 713.643.0681 / Fax : 713.643.4939*

Page 1 of 2

September 2006

EXHIBIT 3

STATE OF TEXAS
COUNTY OF HARRIS

I, Theresa Chang, District Clerk of Harris County,
Texas do hereby certify that the foregoing is a
true and correct copy of the original record, now
in my lawful custody and possession, as appears on
record

In my office and filed on
Witness my official hand and seal of office this

DEC 04 2007

THERESA CHANG, DISTRICT CLERK
Harris County, Texas

By _____ Deputy